YVETTE MUSE,
v.
LOUISIANA STATE BOARD OF ELEMENTARY AND SECONDARY EDUCATION
2007 CA 1146.
Court of appeal of State of Louisiana, First Circuit.
February 8, 2008.
DAVID K. NELSON, JEFFREY N. BOUNDREAUX, BRIAN W. HIGHTOWER, Baton Rouge, La, Counsel for Plaintiff/Appellant.
CHARLES C. FOTI, Jr., Attorney General, KAREN L. GODWIN, UMA SUBRAMANIAN, ANGELIQUE DUHON FREEL, CHERIE LATO, Assistant Attorneys General, Baton Rouge, La, Counsel for Defendant/Appellee.
Before: WHIPPLE, GUIDRY, and HUGHES, JJ.
HUGHES, J.
In this appeal, a former probationary teacher challenges her dismissal. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY
Plaintiff, Yvette Muse, entered into a contract of employment with the defendant, the Louisiana Board of Elementary and Secondary Education (BESE), whereby she agreed to serve as a probationary teacher at the Louisiana School for the Visually Impaired (LSVI) through May 20, 2005. During the 2004-2005 school year, LSVI Superintendent, Janet Ford, received numerous complaints from students, parents, faculty, the parent teacher organization, and the school psychologist indicating that Ms. Muse was engaging in unprofessional conduct towards students, parents, and co-workers, verbally abusing students, inadequately supervising students, and acting in disregard for the health and safety of her students. Ms. Ford stated that Ms. Muse was counseled on four different occasions without success. Ms. Ford believed that further admonitions would likewise be unsuccessful. To avoid further risks to the health and safety of Ms. Muse's students, Ms. Muse was placed on "exigent leave" with pay; her employment was later terminated effective May 6, 2005.
Thereafter, Ms. Muse filed the instant suit against BESE, seeking reinstatement to her teaching position and the reimbursement of back wages and emoluments of office. In the trial court, Ms. Muse filed a motion for summary judgment, and BESE filed a cross-motion for summary judgment. Following a hearing, the trial judge denied Ms. Muse's motion and granted BESE's motion, finding BESE met all procedural prerequisites prior to terminating Ms. Muse's employment and rendering summary judgment dismissing her suit. Ms. Muse has appealed this judgment and asserts on appeal that the trial court erred in: (1) allowing BESE to "cherry pick" the provisions of the Manual[1] it wished to follow while ignoring the provisions that are designed to protect its teachers; (2) finding that Part III, Chapter 5, Section 515 of the Manual does not apply to the proposed dismissal of Ms. Muse; (3) failing to read Part III, Chapter 5, Section 511 and Part III, Chapter 5, Section 515 of the Manual in harmony with each other pursuant to LSA-C.C. art. 13; and (4) in failing to reinstate Ms. Muse to her position with BESE as a probationary teacher at LSVI, together with back pay and all other emoluments of her position, including, but not limited to, full credit for the previous year worked at LSVI, together with judicial interest and all costs of the proceedings.

LAW AND ANALYSIS

Motion for Summary Judgment
The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action, except those disallowed by LSA-C.C.P. art. 969; the procedure is favored and shall be construed to accomplish these ends. LSA-C.C.P. art. 966(A)(2). Summary judgment shall be rendered in favor of the mover if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B).
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Allen v. State ex rel. Ernest N. MorialNew Orleans Exhibition Hall Authority, XXXX-XXXX, p. 5 (La. 4/9/03), 842 So.2d 373, 377; Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La. 1991). In ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party's favor. Hines v. Garrett, XXXX-XXXX, p. 1 (La. 6/25/04), 876 So.2d 764, 765.
A fact is material if it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. Id. at 765-6.
Pursuant to LSA-C.C.P. art. 966(C)(2), the burden of proof remains with the movant. However, if the moving party will not bear the burden of proof on the issue at trial and points out that there is an absence of factual support for one or more elements essential to the adverse party's claim, action or defense, then the non-moving party must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. If the opponent of the motion fails to do so, there is no genuine issue of material fact and summary judgment will be granted. Moreover, as consistently noted in LSA-C.C.P. art. 967, the opposing party cannot rest on the mere allegations or denials of his pleadings, but must present evidence that will establish that material facts are still at issue. Cressionnie v. Intrepid, Inc., XXXX-XXXX, p. 3 (La. App. 1 Cir. 5/14/04), 879 So.2d 736, 738.
Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is material can be seen only in light of the substantive law applicable to the case. Richard v. Hall, XXXX-XXXX, p. 5 (La. 4/23/04), 874 So.2d 131, 137; Dyess v. American National Property and Casualty Company, XXXX-XXXX, p. 4 (La. App. 1 Cir. 6/25/04), 886 So.2d 448, 451, writ denied, XXXX-XXXX (La. 10/29/04), 885 So.2d 592; Cressionnie v. Intrepid, Inc., XXXX-XXXX at p. 3, 879 So.2d at 738-9.

Dismissal of a Probationary Teacher
Under Louisiana's Teacher Tenure Law, each teacher serves a probationary term of three years. During that three-year probationary period, a teacher can be discharged upon written recommendation of the superintendent accompanied by valid reasons therefore. A school board may discharge or decline to renew the contract of a probationary teacher without notice or a hearing. Otherwise, after the three-year period, the teacher automatically becomes a permanent teacher. Although a school board is not authorized to discharge a probationary teacher without any cause at all, the discretion given to a school board in discharging, for valid reasons, teachers during their probationary terms is for the purpose of weeding out personnel whose attitude or performance, while perhaps not so flagrantly faulty as might be required for the discharge of a tenured teacher, indicates that it is undesirable for reasons of efficiency or harmony among others to grant them permanent status as members of the professional education force. Wright v. Caldwell Parish School Board, 98-1225 pp. 3-4 (La. 3/2/99), 733 So.2d 1174, 1176 (citing McKenzie v. Webster Parish School Board, 26,713 (La. App. 2 Cir. 4/5/95), 653 So.2d 215, 218, writ denied, 95-1415 (La. 9/22/95), 660 So.2d 472; Ford v. Caldwell Parish School Board, 541 So.2d 955, 957-958 (La. App. 2 Cir. 1989)).
The law governing the dismissal of probationary teachers in general is found in LSA-R.S. 17:442, which provides:
Each teacher shall serve a probationary term of three years to be reckoned from the date of his first appointment in the parish or city in which the teacher is serving his probation. During the probationary term the parish or city school board, as the case may be, may dismiss or discharge any probationary teacher upon the written recommendation of the parish or city superintendent of schools, as the case may be, accompanied by valid reasons therefor.
Any teacher found unsatisfactory by the parish or city school board, as the case may be, at the expiration of the said probationary term, shall be notified in writing by the board that he has been discharged or dismissed; in the absence of such notification, such probationary teacher shall automatically become a regular and permanent teacher in the employ of the school board of the parish or city, as the case may be, in which he has successfully served his three year probationary term; all teachers in the employ of any parish or city school board as of July 31, 1946 who hold proper certificates and who have served satisfactorily as teachers in that parish or city for more than three consecutive years, are declared to be regular and permanent teachers in the employ of the school board of that parish or city.
(Emphasis added.)
Further, LSA-R.S. 17:45 applies to the probation and tenure of teachers in special schools and provides in pertinent part:
A. As used in this Subpart, the word "teacher" means any certified employee in a special school who holds a teacher's certificate and whose legal employment requires certification under the regulations of the board or of any certification authority established by law. A teacher shall be entitled to tenure benefits as follows:
(1)(a) Each teacher shall serve a probationary term of three contract years to be computed from the date of his first appointment in the special school in which the teacher is serving his probation. During the probationary term, the board may dismiss or dischar'e any probationary teacher upon the written recommendation of the superintendent or other head or director of the special school accompanied by valid reasons therefor.
(b) Any teacher found unsatisfactory by the board, at the expiration of the probationary term, shall be notified in writing by the board that he has been discharged or dismissed; in the absence of such notification, such probationary teacher shall automatically become a regular and permanent teacher in the employ of the special school where he has successfully served his three year probationary term; all teachers in the employ of a special school as of September 1, 1979, who hold proper certificates and who have served satisfactorily as teachers in the special school where employed for more than three consecutive years, are declared to be regular and permanent teachers in the employ of the special school.
(Emphasis added.)
The purpose of enacting LSA-R.S. 17:45 was to extend to teachers in special schools the rights and privileges recognized in LSA-R.S. 17:442. Palmer v. Louisiana State Board of Elementary and Secondary Education, 2002-2043, p. 11 (La. 4/9/03), 842 So.2d 363, 371.
In Palmer, the Louisiana Supreme Court discussed considerations applicable to probationary teachers vis-á-vis Louisiana's Teacher Tenure Law as follows:
Our interpretation of [LSA-]R.S. 17:45 conforms with the legislative intent in drafting the statute. The Louisiana Teachers Tenure Law is designed to protect and insulate all teachers from political reprisal. The provisions of the Teachers Tenure Law must be liberally construed in favor of teachers, since teachers are its intended beneficiaries.
In 1979, the legislature enacted [LSA-]R.S. 17:45 for the purpose of providing some level of protection to teachers who had not acquired tenure status in the special school system. Non-tenured teachers in the public elementary and secondary school systems already had benefit of this protection by virtue of article 17:442. [LSA-]R.S. 17:45 is the parallel provision to [LSA-]R.S. 17:442. In fact, [LSA-]R.S. 14:43 expressly states:
It is declared to be legislative policy that the special schools ... shall provide all benefits, privileges, rights, and powers as provided for certificated teachers in the public elementary and secondary schools in the interest of statewide uniformity of administration of teacher welfare benefits, including but not limited to the benefits enumerated in this Part.
According to [LSA-]R.S. 17:43, the scope and applicability of [LSA-]R.S. 17:45 is coextensive with the scope and applicability of [LSA-]R.S. 17:442. The tenure statutes governing teachers in special schools, [LSA-]R.S. 17:45, et seq. provide the same rights and privileges afforded regular school teachers under R.S. 17:442, et seq. There is no statutory or jurisprudential distinction as to the purpose or intent behind tenure laws affecting special school teachers versus regular school teachers.
Further, a review of the legislative comments surrounding the enactment of [LSA-]R.S. 17:45 (House Bill 317) reveals the legislature's intent that teachers in special schools are to be given the same benefits, privileges, rights and protection as teachers in other public schools under [LSA-] R.S. 17:442. Speaking in support of the Bill was Dr. Bill Baker of the Louisiana Association of Educators. Dr. Baker stated "these teachers should be put in the law just as the elementary and secondary teachers are. These teachers want the same protection as the elementary and secondary teachers." Representative Forest Dunn stated that "these teachers were protected but with the bill it would be put in the law."
In State ex rel. Nobles v. Bienville Parish School Board, 198 La. 688, 4 So.2d 649 (1941), we discussed a teacher's probationary term and the requirements for dismissal during that term under then article 17:442, which applies to public school teachers.
As in the instant case, the plaintiff in Nobles had been hired for two school years, 1938-39 and 1939-40. In each instance, the contract was issued to the plaintiff for that particular school year only. The plaintiff was notified that his employment as principal of the high school would not be renewed. There was no written recommendation for the dismissal of the plaintiff by the Superintendent accompanied by valid reasons therefor to the School Board. The plaintiff filed suit to compel the school board for reinstatement. The trial court rendered judgment in favor of plaintiff, ordering his reinstatement. We affirmed that decision, holding:
The fact that the school board employed the plaintiff by the year or for a period of a year is of no moment. To conclude otherwise would defeat the purpose of the Teachers' Tenure Act. In other words, it would permit school boards to fix a probationary term in derogation of the expressed provisions in the Act. The Act expressly provides that the probationary term of three years begins from the date of the first appointment or employment of the teacher irrespective of whether the contact of employment is for one year or more.
* * *
The statute fixes the probationary term at three years beginning from the date of the first appointment of the teacher. There is no provision for the employment of a probationary teacher for a different period of time. This in our opinion clearly shows that the act contemplates that the employment should cover a period of three years. The period of employment being fixed by statute the school board is without authority to change it by contract or otherwise. To hold that school boards could escape the provisions of the act by employing probationary teachers for a shorter period of time would render the provisions of the Act with reference to probationary teachers meaningless and permit the dismissal of probationary teachers without cause in derogation of the provisions of the Act. (Emphasis added.)
The rights of probationary teachers under [LSA-]R.S. 17:442 were also explained in McKenzie v. Webster Parish School Board, 609 So.2d 1028 (La. App. 2 Cir. 1992). There, a probationary teacher's contract was not renewed. The court explained:
Probationary teachers do not have a constitutionally protected liberty or property interest in the renewal of their teaching contracts which entitle them to procedural due process and their discharge does not involve substantive due process. Thus, a teacher who does not enjoy tenure in his position may be discharged by the school board without notice or a hearing so long as valid reasons for his discharge have been expressed in writing by the superintendent. (Emphasis added.)
Thus, the McKenzie court recognized that, although a probationary teacher is not entitled to a constitutionally protected interest in the renewal of their contracts, BESE must be provided a recommendation with valid reasons before the decision is made not to renew a probationary teacher's contract during the probationary term.
Based on the above jurisprudence, we find the law to be clear that under [LSA-]R.S. 17:45, the probationary term for special school teachers is three years. The dismissal of a teacher during the probationary period requires the Superintendent to provide a recommendation with valid reasons to BESE for the teacher's dismissal. We find no statutory or jurisprudential precedent to the effect that teachers in a special school system should receive less protection than those in other public elementary and secondary schools. As explained above, the very purpose of enacting [LSA-]R.S. 17:45 was to extend the rights and privileges recognized in [LSA-]R.S. 17:442 to teachers in special schools.
Palmer v. Louisiana State Board of Elementary and Secondary Education, 2002-2043 at pp. 8-11, 842 So.2d at 369-71 (citations and footnote omitted; emphasis original).
Written reasons for the dismissal of a probationary teacher that do not provide details are insufficient to support a dismissal, which must contain a specific recitation of facts sufficient to afford the dismissed teacher opportunity for rebuttal. Conclusory charges in a dismissal notice, such as "incompetence" and/or "willful neglect of duty," do not fulfill the statutory requirement. Serignet v. Livingston Parish School Board, 282 So.2d 761, 763 (La. App. 1 Cir. 1973).
Appellate courts have upheld the dismissal of teachers for the following causes, determined to be valid: displaying a pattern of poor judgment and creating disharmonious relationships (Drane v. Richland Parish School Board, 32,067, p. 6 (La. App. 2 Cir. 8/18/99), 740 So.2d 248, 252);[2] interfering with the basketball program, publicly displaying unsportsmanlike conduct, and receiving poor evaluations (Foreman v. Vermilion Parish School Board, 353 So.2d 471, 472 (La. App. 3 Cir. 1977), writ denied, 355 So.2d 257 (La. 1978)); instructing two fifth-graders to write the word "f***" 1,000 times in the presence of other students (after the children reportedly used the word during lunch break) and requiring the students to turn that work in to the principal and their parents for their signatures (Celestine v. Lafayette Parish School Board, 284 So.2d 650, 652 (La. App. 3 Cir. 1973)); and, refusing to comply with the school principal's instructions to present a lesson or demonstration in setting concrete forms to an Industrial Arts class, which would later be used for laying a concrete sidewalk (State ex rel. Williams v. Avoyelles Parish School Board, 147 So.2d 729, 730 (La. App. 3 Cir. 1962)).
In the instant case, Ms. Muse was notified by certified letter, written by BESE's Executive Director, Mary Louise "Weegie" Peabody, dated April 22, 2005, of the following:
The purpose of this correspondence is to inform you that at the April 21, 2005, meeting of the State Board of Elementary and Secondary Education, the Board voted to dismiss you from your probationary employment with the Louisiana School for the Visually Impaired. A copy of Superintendent Picard's written recommendation for dismissal with valid reasons therefore is enclosed. Your probationary employment will end at the close of business on Friday, May 6, 2005.
The recommendation prepared by State Superintendent of Education Cecil J. Picard stated in pertinent part:
I am recommending the dismissal of Ms. Muse effective May 6, 2005.
Valid reasons:
1) Repeated, inappropriate and unprofessional conduct
2) Consistent failure to implement appropriate instruction for multiply handicapped students
3) Failure to follow and implement supervisory directives following multiple counseling sessions
4) Failure to ensure the safety and well-being of multiply handicapped students, through willful disregard for student health conditions....
Attached to Superintendent Picard's recommendation was a detailed listing of the particulars of the reasons given, which stated:

BESE Valid Reasons[3] Yvette Muse

1. Repeated, inappropriate unprofessional conduct
December 16, 2004: Humiliates parent at PTO meeting with angry verbal attack  ignores Superintendent's directive to end the conversation immediately.
 January 20, 2005: Loses composure and yells at student [QC]
 [LW] reports to infirmary with elevated blood pressure
Parent of [LW] calls and complains
Student [AL] in tears
Parent of [QC] calls to complain
 February 18, 2005: Muse was responsible for watching students  did not comply and sent students outside into a construction area, unsupervised.
 February 25, 2005: Verbal complaint by student [LD] of Muse's treatment of her. Student complained that Muse berated her in front of her class, in a loud, angry tone.
 March 2, 2005: Muse lost composure and yelled so loud at students that neighboring teachers heard.
 March 3, 2005: Muse lost composure and yelled so loud at students that neighboring teachers heard.
 April 4, 2005: Muse lost composure; students and teachers complained of Muse's yelling; [LW] to infirmary with elevated blood pressure, caused by Muse berating her in front of her class; multiple students complained of Muse's angry screaming.
 April 5, 2005: Muse lost composure; student and teacher complaints of yelling; [LW] to infirmary with elevated blood pressure; multiple students complained of Muse's angry screaming at students.
2. Consistent failure to implement appropriate instruction for multi-handicapped students.
 October 15, 2004: Parent complaint over treatment of multi-handicapped child; this parent described Muse's conduct as including loud, uncontrolled angry outbursts; [AL] is an 8.5 grade level student performing at the 5th grade level with "extreme problems in retaining skills over time"; displays "sensory integration problems that were most evident in her ability to function in noisy environments; crying and other signs of distress were extreme" (per IEP). Muse wrote this section of [AL]'s IEP (general student information), so she was familiar with [AL]'s disabilities; in spite of this knowledge, Muse repeatedly screamed at [AL] for behavior which was a manifestation of her disabilities, such as forgetting [M]ath principles, forgetting homework, and easily frustrated; Muse also ignored the fact that [AL] is hypersensitive to noise, and continued to scream at her; Muse violated federal and state law by failing to implement [AL]'s IEP.
 August 9, 2004  April 7, 2005: [LW] is a multi-handicapped child with heart condition and uncontrolled blood pressure. During this time period, Muse repeatedly screamed at this student in a loud, angry tone, berating her in front of the class because the student did not bring her homework to class. Muse's angry outbursts were so upsetting to [LW] that she had to go to the infirmary on numerous occasions because of elevated blood pressure and crying.
3. Failure to follow and implement supervisory directives following multiple counseling sessions.
 October 21, 2004: Counseled regarding behavior, including loud, angry outbursts toward students.
 December 16, 2004: Disobeyed directives to end conversation with parent.
 January 24, 2005: Reprimand concerning Muse's loud, angry outbursts toward student.
 March 15, 2005: Meeting with Muse and Supt. Ford concerning loud, angry outbursts.
 All admonishments, counsellings [sic] and reprimands are ignored by Muse.
4. Failure to ensure the safety and well-being of multiply handicapped student's], through willful disregard for student health conditions.
 January 20, 2005: [LW] seen in infirmary with elevated blood pressure caused by Muse's loud, angry outbursts at [LW] in front of her class.
 January 18, 2005: Allowed students to enter construction zone unsupervised.
 March 2, 2005: Berated students in a loud, angry tone in front of peers, causing [AL] to become so upset that she was unable to benefit from educational instruction for the remainder of the day.
 March 3, 2005: Berated students in a loud, angry tone in front of peers, causing [AL] to become so upset that she cried and was unable [to] benefit from educational instruction for the remainder of the day.
 April 4, 2005: Berated students in a loud, angry tone in front of peers, causing student with uncontrolled hypertension to go to the infirmary with elevated blood pressure.
 April 5, 2005: Verbal outburst toward students, causing student with uncontrolled hypertension to go to the infirmary with elevated blood pressure.
In her affidavit, Ms. Peabody identified these documents, which were filed into the trial court record on motion for summary judgment, with and as attachments to the Peabody affidavit. Ms. Peabody's April 22, 2005 dismissal letter to Ms. Muse indicated that Superintendent Picard's written recommendation and the detailed reasons were included in her correspondence to Ms. Muse.
We conclude that Ms. Peabody's dismissal notice to Ms. Muse was sufficient to satisfy the legal requirements discussed hereinabove. However, we agree with Ms. Muse that an additional level of notice has been extended in a disciplinary action to Louisiana's special school teachers by the State's "Personnel and Administrative Manual of Special School District and Board Special Schools" (Manual), which at the pertinent time stated in Part III, Chapter 5:
§ 515. Due Process
* * *
B. Disciplinary Actions Other Than Reprimand
1. Non-tenured employees
a. Prior to the proposed disciplinary action, the employee shall be given written notice of the proposed action and the reason(s) therefor, a description of the evidence supporting the proposed action which contains such information as will fully inform the employee of the conduct for which the action is being considered and will enable him/her to prepare a defense, including, where pertinent, the date, time and place of such conduct and the names of persons directly involved in or affected by such conduct (unless their identities are protected by law, in which case, identification shall be [made] as permitted by law); and a reasonable opportunity to respond, in writing as to why the proposed action should not be taken, or why a less severe action should be taken.
b. After the employee's response, if any, is received and reviewed, the employee will be provided written notice detailing the disciplinary action, if any, that will be taken and setting forth the reasons therefor. Said notice shall be delivered to the employee prior to the effective date of the disciplinary action....
c. Unclassified probationary employees have no right to a hearing.
We conclude that these provisions of the Manual, specifically § 515 (B)(1)(a)), though not otherwise mandated by law, oblige the State to provide an additional level of notice. Not only must the State provide detailed notice of dismissal pursuant to LSA-R.S. 17:45 and 17:442 (as also indicated in the Manual at § 515 (B)(1)(b)), but § 515 (B)(1)(a) also requires a written notice prior to the proposed disciplinary action, which includes detailed and specific reasons for the proposed disciplinary action, and which allows the teacher a reasonable opportunity to respond in writing as to why the proposed action should not be taken or why a less severe action should be taken.
The State argues that § 515 of the Manual does not apply to dismissals, but rather only to other disciplinary actions. We do not agree. Chapter 5 of Part III ("Employee Personnel Activities") of the Manual is entitled "Disciplinary Actions." Chapter 5 states: "Disciplinary actions for unclassified employees are subject to [BESE] approval and shall include oral reprimand, written reprimand, suspension, demotion, reassignment or dismissal for causein accordance with applicable law...." (Emphasis added.) Chapter 5 further states: "Disciplinary action includes the following: § 501. Reprimand....§ 503. Suspension.... § 505. Demotion.... § 507. Reassignment.... § 509. Resignation in Lieu of Discipline.... § 511. Termination.... § 513. Other Actions...." (Emphasis added.) Chapter 5 concludes with § 515, entitled "Due Process," under which Paragraph B is expressly made applicable to "Disciplinary Actions Other Than Reprimand." The dismissal or termination of the employment of a teacher is unambiguously included as a disciplinary action. Accordingly, § 515 procedures must be applied to dismissals.
In support of its motion for summary judgment before the trial court, the State met its burden to show no material question of fact remained as to its having provided the statutorily required notice of dismissal pursuant to LSA-R.S. 17:45 and 17:442. However, the State did not establish that the Manual § 515 (B)(1)(a) notice was provided to Ms. Muse; therefore, we next examine the consequences of this omission.
We note that when the notice has not been given in accordance with LSA-R.S. 17:45 and 17:442, dismissal is considered invalid, and the plaintiff/teacher is entitled to reinstatement to his/her original status along with back pay from the date of the dismissal together with legal interest from the date of judicial demand until paid, as stated in Palmer v. Louisiana State Board of Elementary and Secondary Education, 2002-2043 at p. 12, 842 So.2d at 371. Because Ms. Muse was afforded the notice required by LSA-R.S. 17:45 and 17:442, we conclude her dismissal was not invalidated on this basis, and thus the damages outlined in Palmer are not implicated.
The issue in this case then becomes whether any damages are owed for the failure of the State to issue the additional notice and allow a formal opportunity to respond by the teacher as required by the Manual's § 515 (B)(1)(a).
It is forseeable that in some cases, a school may have compelling reasons for dismissing a teacher, which no comment or explanation on the part of the teacher could assuage or eliminate. In such instances, the failure to give the additional notice and opportunity to respond required under § 515 (B)(1)(a) of the Manual may have caused no damage to the plaintiff/teacher.
In Ms. Muse's case, she has failed to show on motion for summary judgment that she was damaged by the State's failure to provide the Manual's secondary level of notice. Ms. Muse was afforded at least four counseling sessions during which the allegations of misbehavior made against her were discussed with supervisory personnel. Presumably, during these counseling sessions and/or thereafter Ms. Muse had an opportunity to dispute the accuracy of the complaints against her.
After a thorough review of the exhibits introduced in support of the State's motion for summary judgment before the trial court, we conclude that Ms. Muse was notified of specific allegations of misconduct against her well in advance of the proposed disciplinary action. Attached to the affidavit of Ms. Muse's LSVI supervisor, Janet Ford, was a copy of Ms. Ford's written memorandum to Ms. Muse dated February 10, 2005, which stated:
I am in receipt of your memorandum dated January 31, 2005 regarding our meeting on Monday, January 24, 2005.
At that meeting, you were told that it was your second counseling session. This is correct. On October 21, 2004 at 2:30 p.m., you met with Mrs. Jones, the Director of Education, to discuss [name omitted's[4]] complaint regarding her daughter [name omitted]. You had previously been in written contact with [name omitted]. The parent felt it necessary to speak with me personally regarding [name omitted's] [M]ath class, the information you provided, and the tone of your response to her request.
[Name omitted] shared a series of concerns with Mrs. Jones and me. These included but were not limited to:
1. [Name omitted's] social interaction with [name omitted] being restricted as punishment for not completing [M]ath homework. (Academic infractions must have academic punishment.)
2. [Name omitted] alleged your behavior toward her caused embarrassment in front of her peers. ([Name omitted] alleged you told her that she was "too immature for a boyfriend.")
3. [Name omitted] does not always understand the concepts being presented and is afraid to ask questions based on your behavior and attitude toward her.
During your meeting with Mrs. Jones, you acknowledged that homework is a problem for [name omitted]. You also agreed that [name omitted] often turned in work which did not resemble what was being taught. You appeared frustrated to Mrs. Jones. You were also counseled concerning inappropriate punishment for an academic infraction. You agreed to be more cognizant of [name omitted's] feelings.
This was considered your first counseling session. This is a component of the accountability process and as such is documented. You were also informed that Mrs. Jones would be observing your classroom and that she expected to see [name omitted] interacting comfortably with you and the class.
On December 16, 2004 at the Parent Teacher Organization meeting held in Dorm C, you approached [name omitted] and demanded the return of [name omitted's] paper which she had requested via written note. I personally stepped forward and told you to drop the conversation until a more appropriate time as I could see that she was visably upset. According to [name omitted's] written complaint of January 5, 2005, you not only continued the discussion, but you also, in her words, "lectured her about being a good Christian".
[Name omitted] felt she was being reproached for exercising her right to discuss her daughter's education. According to [name omitted] and others in attendance, you continued to humiliate her. She appeared in Mrs. Jones's office in tears. She was visibly upset and asked that [name omitted] be removed from your class. This was blatant insubordination on your part for ignoring my directive to drop the conversation.
All of this occurred over papers which belonged to the child, had been graded and supposedly recorded. The parent has the right to request, review and retain work samples. Had you needed the papers returned, you should have stated so in your letter to her.
On January 20, 2005 an incident occurred in your classroom involving [name omitted]. You appeared frustrated because [name omitted] did not have his homework. You admitted in our January 24, 2005 meeting that you raised your voice. [Name omitted's] word to describe the incident was "hollering". [Name omitted's] description of the incident was confirmed by other adults and students well outside the walls and area of your classroom.
As a result of the incident with [name omitted], word spread among the children, and [name omitted] and [name omitted] became very upset and fearful  [name omitted] to the point that she reported to the Infirmary with elevated blood pressure and hysterics. This resulted in phone conferences with parents in which I was forced to explain your actions.
At the January 24, 2005 meeting, Mrs. Jones and I both cautioned and counseled you about inappropriate actions regarding special needs students. You admitted you become frustrated with the students and tend to get loud.
Our January 24, 2005 meeting was your second formal counseling session. Therefore, please note you have been:
Counseled on October 21, 2004 regarding your treatment of [name omitted] and [name omitted].
Counseled on January 24, 2005 regarding your treatment of [name omitted] [on] January 20, 2005 and your treatment of [name omitted] and your insubordination on December 16, 2004.
I have verbally and by this memo informed you that insubordination, outbursts, and/or unprofessional, rude, and verbally or physically abusive behavior will not be tolerated.
In response to your request for policy, please note that all actions do not require written policy. We do have conflict resolution policy for students. Teachers and employees have due process, and grievance policy and procedures. However, we cannot dictate policy to parents. It would be impossible to create a written policy for every situation that may arise in a residential educational facility for students with special needs. The ability and willingness to exercise sound judgment is a critical skill that all teachers must possess. The absence of a written policy does not excuse a teacher from inappropriate behavior including dealing with parents in a way that forces them to address their concerns to the Superintendent; doling out punishments that do not address students' areas of need; embarrassing students by questioning their maturity; preventing students from learning by instilling fear in them to the point that they are afraid to ask questions in class; failing to address students' needs after acknowledging that they have problems with homework and that their work does not resemble what you are responsible for teaching; being insubordinate to a principal, superintendent, or any other supervisor; lecturing parents about their religion; and "hollering" at students  particularly at a level that can be heard well outside your classroom.
You cannot be allowed to put our students' parents in tears, to upset students to the point of physical manifestations, or to put LSVI in a position to have to explain your inappropriate actions to understandably upset parents.
A copy of this memorandum will be placed in your personnel file.
While the memorandum from Ms. Ford to Ms. Muse sufficiently detailed the specifics of misconduct that would justify dismissal of Ms. Muse's employment as a teacher, it did not satisfy the Manual § 515 (B)(1)(a) notice requirement in that it did not apprise Ms. Muse that disciplinary action in the form of dismissal was at that time proposed. The State has not suggested any other document offered in connection with its motion for summary judgment that met the requirements of its Manual pursuant to § 515 (B)(1)(a). However, Ms. Ford's memorandum to Ms. Muse specifically informed Ms. Muse that the behaviors itemized would not "be tolerated," suggesting that further disciplinary steps would follow.
Considering the counseling sessions preceding the Ford memorandum, the additional two counseling sessions that followed it, and Ms. Muse's continuing history of infractions, she has not shown that any omission on the part of the State in complying with § 515 (B)(1)(a) of the Manual deprived her of any genuine opportunity to avert the dismissal of her probationary employment as a teacher at LSVI.
More importantly, Ms. Muse failed to produce any evidence that the State was without a valid reason for the termination of her employment. Consequently, we cannot say the summary judgment granted in favor of the State, nor the denial of Ms. Muse's summary judgment, was in error.[5]

CONCLUSION
For the reasons assigned herein, the trial court judgment is affirmed. All costs of this appeal are assessed to appellant, Yvette Muse.
AFFIRMED.
GUIDRY, J., dissents and assigns reasons.
GUIDRY, J., dissenting.
While the memorandum from Ms. Ford to Ms. Muse detailed misconduct, it did not satisfy the Manual § 515(B)(1)(a) notice requirement in that it did not apprise Ms. Muse that disciplinary action in the form of dismissal was proposed at that time. The State has not suggested any other document offered in connection with its motion for summary judgment that met the requirements of its Manual pursuant to § 515(B)(1)(a). Therefore, the trial court's granting of summary judgment was error.
NOTES
[1] Personnel and Administrative Manual of Special School District and Board Special Schools."
[2] In Drane, the school board asserted that the dismissed teacher had: threatened a child that if he did not stop tapping a pencil on his desk that she would "shove it up his b[***];" held down one child and allowed another to kick him; refused to let a first grader go on a field trip to a Christmas tree farm because the child had not finished some Math work; failed to place a hearing-impaired boy in the front of the classroom after receiving a request to do so by his parent, and later initially failed the child in reading, but later adjusted his grade to passing; intimated to certain parents that they needed to make a special effort to be at an awards day, at which their children did not receive an award; had a "run-in" with another teacher and refused to resolve her differences with the teacher after being instructed to do so; demonstrated financial irresponsibility by extending credit to help parents afford cheerleader outfits in the amount of $1,600.00 and giving the parents nine months to pay, without consulting the principal; and made spiteful remarks to co-workers that created an environment of disharmony. Drane v. Richland Parish School Board, 32,067 at pp. 5-6, 740 So.2d at 251-52.
[3] This document contained a rubber stamp across the center reading, "CONFIDENTIAL ADDENDUM."
[4] Where indicated, the names of referenced parents and students were obscured in the copy of Ms. Ford's memorandum to Ms. Muse filed in the trial court record.
[5] Having decided this appeal on these bases, we find it unnecessary to address the remaining assignments of error.